UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
DREAMTITLE PUBLISHING, LLC, A          :
CALIFORNIA COMPANY,                     :
                                        :
                            Plaintiff,  :           1:22-cv-7500-GHW
                                        :
            -against-                   :           MEMORANDUM OPINION
                                        :             AND ORDER
PENGUIN RANDOM HOUSE LLC, A            :
DELAWARE COMPANY, *et al.,*              :
                                        :
                            Defendants. :
                                        :
---------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/5/2023

GREGORY H. WOODS, United States District Judge:

## I.     INTRODUCTION

Betty Bynum, the owner of Plaintiff Dreamtitle Publishing, LLC, wrote an illustrated

children's book about a day in the life of Joshua, a Black boy.  The book was designed to promote

self-esteem for Black boys.  When Defendants published an illustrated children's book with the

same broad theme, Plaintiff sued, claiming that Defendants' book violated its copyright.  Because an

analysis of the total look and feel of the two books makes clear that they are not substantially similar,

Defendants' motion to dismiss this action is GRANTED.

## II.     BACKGROUND

### A.     Factual Background[1]

In 2015, Betty Bynum wrote *I'm a Brilliant Little Black Boy* ("Plaintiff's Work"), an illustrated

book for children.  First Amended Complaint, Dkt. No. 14 ("FAC"), ¶ 12; FAC Ex. A.  Ms.

---

[1] Unless otherwise noted, the facts are taken from the complaint and are accepted as true for the purposes of this
motion.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "the tenet that a court must accept
as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662,
678 (2009).

Bynum's son, Joshua B. Drummond, and illustrator Brian McGee contributed to the creation of the book pursuant to work-for-hire agreements. *Id.* Ms. Bynum owns Plaintiff Dreamtitle Publishing, LLC ("Plaintiff" or "Dreamtitle") and operates the company from her home. *Id.* ¶¶ 3, 13. Dreamtitle owns the copyright in Plaintiff's Work. *Id.* ¶ 16.

Dreamtitle published the work in November 2016. *Id.* ¶ 13. Prior to its publication, Ms. Bynum promoted Plaintiff's work "on several media channels, most notably via an appearance on the *Steve Harvey Show . . . .*" *Id.* ¶ 18. Plaintiff alleges that Plaintiff's Work "received critical acclaim and celebrity endorsements," and that it was a commercial success. *Id.* ¶¶ 20, 21. Plaintiff's Work is available for sale at major online retailers like Target and Amazon. *Id.* ¶ 23. Plaintiff sold over 15,000 copies of the work on Plaintiff's online Shopify account alone.

*I'm a Brilliant Little Black Boy* is part of a collection of books published by Plaintiff: the "*I'm a Girl!*" collection. *Id.* ¶ 14. The collection "is comprised of illustrated children's books designed to inspire youths of a specified demographic and promote pride in children's cultural identities." *Id.* ¶ 15. The series began with the 2013 publication of *I'm a Pretty Little Black Girl!* and continued with *I'm a Lovely Latina!,* which was published in 2015. *I'm a Brilliant Little Black Boy* rounded out the collection.

Penguin Random House, LLC ("Penguin") and Nancy Paulsen Books ("Paulsen" and, together with Penguin, "Defendants") published *I Am Every Good Thing* ("Defendants' Work") in September 2020. *Id.* ¶¶ 4, 5, 25. Defendants' Work is also an illustrated children's book that centers on young Black boys. Plaintiff claims that its work and Defendants' Work are substantially similar.

### B.    Procedural History

#### 1.    The Complaint

This case was initially brought by Ms. Bynum, acting *pro se*. Her complaint was filed on August 31, 2022. Dkt. No. 1. In her initial complaint, Ms. Bynum alleged that she was the owner of

the copyright in Plaintiff's Work. *Id.* ¶¶ 14, 15. Counsel entered a notice of appearance on Ms. Bynum's behalf on October 20, 2022. Dkt. No. 6. The Court held a conference regarding a proposed motion to dismiss the complaint on January 6, 2023. Dkt. No. 22. Following that conference, Ms. Bynum requested, and was granted, leave to file an amended complaint. Dkt. No. 23.

The first amended complaint was filed on January 20, 2023. FAC. That complaint is the operative complaint for purposes of this motion. In the first amended complaint, Dreamtitle stepped in as Plaintiff, and Ms. Bynum's personal claims were dismissed. As described above, the complaint alleges that Dreamtitle, rather than Ms. Bynum, is the owner of the copyright at issue.

The complaint characterizes what Plaintiff views as the originality of Plaintiff's Work and the similarity between that work and Defendants' Work. While ultimately, the works speak for themselves, and Plaintiff's allegations are in many ways best viewed as characterizations of the works—or arguments—rather than as facts, it is helpful to provide an overview of the assertions made in the complaint regarding the alleged similarity between the works in order to frame the discussion that follows.

The complaint asserts that the books are physically similar: "the works are nearly identical in format," the complaint asserts. *Id.* ¶ 31. According to the complaint, both works "are 11 ½ x 9 ¼ inches in size;" "are 32 pages long," and "feature glossy covers with foil embossing." *Id.*[2] The complaint also asserts that the works' similarity in "theme, tone, and mood" supports Plaintiff's claim for copyright infringement. *Id.* Plaintiff asserts that the shared theme is the promotion of "self-esteem of young black boys by use of the themes of affirmation and self-empowerment . . . ."

---

[2] As will be described below, the complaint's characterization of the works is not fully accurate. That is the case even with respect to these basic physical traits of the books: the books are not the same size; and they do not have the same number of pages. While the cover of each work has metallic foil embossing, Plaintiff's Work has a fringe of silver stars that traverse its cover, whereas the title of Defendants' Work is written in metallic gold.

*Id.* The complaint points to the use of the words "I Am" in the title of each of the two books to establish the similarity in the works. *Id.*

According to the complaint, Defendants' Work violates Plaintiff's copyright because the two works share a common "tone and mood." *Id.* "Both works take on celebratory, earnest tones designed to uplift readers . . . and share the desire to promote positive cultural representations of young black boys and do so effectively . . . ." *Id.* Because Defendants' Work celebrates the representation of young Black boys, Plaintiff contends, it violates Plaintiff's copyright.

The complaint sees similarities in the "character, plot, and sequence of events" represented in the two works that support Plaintiff's copyright claim. Plaintiff describes its work as one that "follows a young black boy named Joshua who narrates his own story in the first person, and conveying the lessons he has learned about life, himself, and his Blackness, in short prose episodes accompanied by cartoon-like visual images." *Id.* Plaintiff acknowledges that, unlike Plaintiff's Work, "there is no major protagonist" in Defendants' Work. But Plaintiff sees a similarity in the characters represented in the two works because "the same unnamed character in several of the double-page spreads: a young Black boy, the same age as Joshua, portrayed doing several of the same activities." *Id.* For the sake of clarity, Plaintiff does not allege that this young Black boy who it asserts to be "the same age as Joshua" appears throughout Defendants' Work—he allegedly appears only in "several of the double-page spreads." *Id.* The complaint does not identify which of the numerous young Black boys depicted in Defendants' Work is purportedly of the same age as Joshua. The complaint cites to one of several appended expert reports: the purported expert asserts that he sees similarities of the type that would support an infringement action because both Joshua and some of the Black boys depicted in the Defendants' Work are "lean . . . [and] slightly average, average in terms of height and build." *Id.*

The complaint also alleges that the plot and characters in the works "share qualitative similarities in that they are created to expand the representational field for Black male children so that as many young Black male readers can identify with the characters and activities shown throughout the book." *Id.* Plaintiff finds support in its copyright claim against Defendants' Work in the fact that young Black readers can identify with the stories presented in each of the books. And the complaint points to the fact that the two works featuring young Black boys also depict other young Black boys throughout. One of Plaintiff's purported experts attributes significance to this fact as a basis for Plaintiff's copyright claim: "These other Black characters serve as a cohort for Josh [and the unnamed character in Defendants' Book] . . . a wide range of Black male kids, making it easier for a range of Black children to see themselves in the book's visual representations, and therefore identify with the story." *Id.*

The complaint alleges that the books are similar because the "plots follow the protagonist as they engage in various activities at a similar if not identical pace." *Id.* Plaintiff sees meaningful protectible similarities between the works because they each portray protagonists engaging in "various activities."

The complaint alleges that the visual illustrations in the works are "visually alike." *Id.* The only cross-cutting contention regarding the nature of the art work's similarity is that the "illustrations in both works use negative space in the same way." *Id.* But Plaintiff's complaint acknowledges that the style of the artwork of the two works differs. *Id.* ¶ 32 ("the Work's artistic style is cartoonish, and Defendants' book [is] more in a brushstroke style . . . .").

The complaint then targets the fact that the two works contain images of "characters participating in the same activities[,] including basketball, hip hop, and science experiments." *Id.* Plaintiff focuses on several selected images from each of the Works in which Plaintiff sees meaningful similarities in the nature of the activity depicted, or the postures of characters. First, are

images of children wearing a cape who, Plaintiff asserts, are both flying.  The complaint also contends that both works feature images that are "space-themed":  In Plaintiff's Work, the child is peering upwards through a telescope; in Defendants' Work, a child looks down through a microscope.  *Id.*  The complaint targets two images from each work in which Joshua is held aloft with a basketball in his hands.  *Id.*  In Plaintiff's Work, he is held aloft by a group of friends in celebration; in Defendants' Work, a child is held up by his father.

The complaint highlights that both works "feature a panel of a young black boy performing hip hop."  *Id.*  In both images of hip hop performances, the rapper uses a microphone and people around him make hand gestures.  The complaint highlights other allegedly troubling similarities in the fact that both works "feature a panel of a young black boy, from the upper chest up, with his arms outstretched."  *Id.*  In Plaintiff's Work, Joshua stands fully clothed surrounded by a field of stars and emblems of his accomplishments—microphone, telescope, Superman cape; in Defendants' Work, a boy is shown shirtless, with his arms outstretched, splashing in a pool surrounded by friends.  And, finally, the complaint focuses on the fact that in both works "there is an illustration of a crowd or montage of headshots of young Black boys who vary in age and tone . . . ."  *Id.*  In Plaintiff's work, that group of boys are Joshua and his "cohort" of friends; in Defendants' Work, the boys are joined by historic Black figures.

Plaintiff attached to its complaint a number of reports by purported experts.  The first purported expert report includes no attribution to its author.  Dkt. No. 24-9 ("Ex. I").  It contains a number of outlines of images from the two books and is described by the purported expert as "EVIDENCE OF BOOK THEFT BY OUTLINE OF ILLUSTRATIONS."  The second purported expert report was authored by David Román, a Professor of English at the University of Southern California.  Dkt. No. 24-10 ("Ex. J").  His report was "submitted" on February 16, 2021.  *Id.* at ECF p. 98.  In it, Professor Román explores what he describes as the "various similarities"

between the two works and concludes that, in his view, "*I Am Every Good Thing* borrows heavily from *I'm a Brilliant Little Black Boy!*" *Id.* at ECF p. 97.

Plaintiff's third purported expert report that is attached to the complaint was authored by Yusuf Lamont, "Illustrator/Designer/Art Director." Dkt. No. 24-11 ("Ex. K"). Mr. Lamont reviews what he perceives as the similarity in a series of images from each work: these are principally the images highlighted in the principal part of the complaint. Mr. Yusuf also notes that each Work contains poems about rap in which the words "rhyme" and "time" are used as rhyming couplets. Mr. Yusuf also identifies as a problematic indicator of copying the fact that both works use the onomatopoeia "BOOM BOOM" to describe the sound of a bass line. Mr. Yusuf also points to the use of a phrase in Defendants' Work—"I am my ancestors' wildest dream"—to support his conclusion that Defendants' Work violates Plaintiff's copyright, even though the phrase does not appear in Plaintiff's Work. *Id.* Based on his evaluation of the similarities in the work that he highlights, Mr. Yusuf's conclusion is that "This is a case of 'Doggonit! They robbed me!'" *Id.* at ECF p. 108.

Plaintiff's final purported expert report that is attached to the complaint was authored by Lawrence Christmas, an "Art Director/Artist" in the children's licensing industry. Dkt. No. 24-12 ("Ex. L"). Mr. Christmas notes that "the art style of the books in question do not match, one being painterly and one being line art with a color fill . . . ." *Id.* at ECF p. 110. He finds substantial similarity between the works, however, based on an assessment of a number of specific images contained in the two works—again, principally those highlighted in the complaint, showing children flying, rapping with a microphone, standing together with other children, holding basketballs, conducting science experiments, and raising their arms in the air. Mr. Christmas again recognizes that "[w]e have one book using a more cartoon-like style with a simpler color use. The other uses a more painterly style with more complex and finer gradation of color. These differences do to [sic]

separate the two books, but there are similarities that go beyond coincidence.  i.  similar poses.  ii. similar poses.  iii.  Similar themes.  iv.  Similar layouts for spreads."  Based on those similarities, Mr. Christmas questions "why did Penguin's editor and art director choose [s]imilar themes to the ones used by Ms. Bynum's book. . . .  The theme similarities seemed more than coincidental."  *Id.*

### 2.      The Motion to Dismiss

Defendants filed their motion to dismiss the amended complaint on February 27, 2023. Dkt. No. 30 (notice of motion); Dkt. No. 31 (memorandum of law) ("Ds Mem.").  For purposes of their motion, Defendants do not contest Plaintiff's ownership of a valid copyright in Plaintiff's Work.  Nor do they contest whether or not they had access to Plaintiff's Work.  Instead, the motion focuses on the argument that the two works are not "substantially similar" and that, therefore, Plaintiff's copyright claim must be dismissed.  Defendants' motion also requests that the Court strike Plaintiff's purported expert reports from the complaint.  *Id.*  On March 20, 2023, confronted by the argument that Plaintiff's first report by a purported expert, Exhibit I, had been authored by Ms. Bynum's husband, Plaintiff withdrew the report.  Dkt. No. 34.

Plaintiff filed its opposition to the motion to dismiss on March 20, 2023.  Dkt. No. 33 ("Opp'n").  In its opposition, Plaintiff argues that the two works are substantially similar.  Among other things, Plaintiff argues that the theme, tone and mood of the works are substantially similar. The works are similar, Plaintiff argues, because Plaintiff's book promotes self-esteem and empowerment of young Black boys, and Defendants' Work does so as well.  *Id.* at 8.  In Plaintiff's view, the fact that both works impart a message of empowerment for Black children, and are "earnest and heartfelt" and "joyous and loving" make the books substantially similar.  *Id.* at 8-9. Plaintiff points to the fact that Plaintiff's Work repeats the phrase "I am" in connection with Joshua's positive achievements as a means of conveying the work's positive theme.  *Id.* at 8.

Plaintiff also asserts that the characters, plot and sequence of events in the two books are substantially similar. *Id.* at 9. Defendants' Work violates Plaintiff's copyright, Plaintiff asserts, because both contain "affirmational and empowering sequences containing discrete scenes of young Black boys in varied (but substantially overlapping) states of activity and interest." *Id.*

Plaintiff's counsel contends in its opposition that "Defendants' Book is virtually identical in narrative structure and in its characters" to Plaintiff's Work. *Id.* 10. How Plaintiff can contend that the books are "identical" in narrative structure is unclear, however, since their opposition brief concedes that Plaintiff's work follows a single central protagonist, and "Defendant's Book lacks a framing narrative . . . ." Plaintiff seems to root its assertion that the books are "virtually identical" despite the fact that Plaintiff's Work follows a particular character, and Defendants' Work does not, in the argument that "all [Defendants' Works'] scenes depict grade-school-aged Black boys, with one boy of similar appearance to Joshua framed as the central character in each scene, surrounded by other similarly aged Black boys." *Id.* at 10.[3] Plaintiff also argues that the works are substantially similar because each of the books contains images of a Black boy associated with a "particular interest, skill or activity." *Id.* Plaintiff asserts (incorrectly) that Defendants' Work has a "virtually identical layout to Plaintiff's book, employing the same consistent double-page spread to convey the same themes and content." *Id.* Like many of Plaintiff's characterizations of the works, this description is inaccurate, as Defendants' Work does not always use double-page spreads for each image.

Plaintiff's opposition also argues that a meaningful similarity between the two works can be found in the fact that each presents "stand-alone scenes with text-specific affirmations that are

---

[3] It is unclear what, apart from the fact that the children are Black, leads Plaintiff to characterize the boys depicted as being of "similar appearance." Defendants comment that "Plaintiff offensively lumps together each of the several main characters in *Every Good Thing* and Joshua to argue that all of these Black boys look alike and 'share the same skin color and physical appearance as Joshua; each is lean (but not muscular) with just slightly above-average height.'" Reply at 6.

accompanied by visual images supporting the theme and which relate to the activity shown on that page.  Both books use these affirmations to tell their story." *Id.* at 11.  Plaintiff also argues that a finding of substantial similarity between two illustrated books for children supporting a claim for copyright infringement can be found in the fact that a "reader can open up either book at any page and comprehend and enjoy that double-page spread, without necessarily having [to] read the book from the beginning." *Id.* at 12.

Plaintiff's opposition then points to similarities in the imagery used in the two books. Plaintiff does not contend that the artistic style of the two works is the same.  It cannot because Plaintiff's purported experts highlight the substantial difference in the artistic style deployed in each work.  Instead, Plaintiff points to the similarities in several particular images, as detailed in the complaint.  Plaintiff also argues that a finding of substantial similarity is supported by the fact that the endpapers of both works are in black-and-white, while the interior pages use color.  And it contends (incorrectly) that the works are the "exact same length" and of "virtually identical" size.  *Id.* at 14.

### C.    The Works

Before turning to an assessment of whether the works are substantially similar, a brief description of each of the works will be helpful for the reader.

#### 1.    *I'm a Brilliant Little Black Boy!*

##### a)    *Narrative*

*I'm a Brilliant Little Black Boy!* follows the story of Joshua, the Black boy of the book's title. Joshua lives in a substantial, stand-alone house in what appears to be a bourgeois suburb.  The books opens with an image of Joshua in his large bedroom, his mother perched on the bed with Joshua reading a book; a smiling father walking through the bedroom with another book in his hand, and, to complete the idyllic image, a panting dog staring out the window.  A framed certificate

on the wall marks Joshua as the "Student of the Month."  The story begins at night--with Joshua

being put to bed by both of his parents—his mother exhorting him to "be brilliant."  Joshua

commits that after he sleeps he'll be "ALL THAT when I wake."



The book then follows the course of Joshua's day after he wakes.  First, the book follows

Joshua as he goes to school, beginning with "Adventure Day at school is my favorite day . . . ."  The

book continues with several more pages recounting Joshua's day at school:  he reads books in the

school library; conducts a science experiment in class; and then attends art class, which is "really

cool."  One panel shows Joshua at rapping with friends, something that Joshua recounts he does

"before school and even lunch time."  The panel shows a picnic table with children eating lunch

from a neatly-packed lunch bag, and other children playing in the background.



Plaintiff's Work then follows Joshua as he plays outside of school in his elysian, tree-lined suburban neighborhood.  In the first spread showing Joshua at play, he is pretending to be a superhero.  Joshua wears a red cape over the red tee-shirt that he wears in nearly all of the other pages of Plaintiff's Work.  There are two bands of images on the page, each depicting a series of events in two separate narratives.  The top band first shows Joshua leaping jumping off of a desk.  To the Court's eye, he is leaping over a chair—one that matches the desk in color and design.  The work next shows Joshua landing, bending his legs, and springing up to land atop a wall.  The accompanying text makes it clear that the series of images show Joshua jumping on and over furniture.  ("Jump off the table!  Jump off the chair! . . .  A SUPERHERO jumps the wall!").



The Court highlights that the image and accompanying text plainly show Joshua jumping while wearing a cape because Plaintiff argues that the second image in the upper band depicts Joshua "leaping or flying." FAC at 9. But Joshua's positioning in the air looks little like the flight of a superhero: Joshua's legs are extended forward—one leg stretches well ahead of Joshua's face. Superman does not fly with his feet in front of his face. But it is the way that someone would want to position their body to land after a jump. All of the other images in the series in the top band depict the act of jumping, and that act is, indeed, what the accompanying text describes.

The lower band of images in this panel shows Joshua engaged in another classic trope—rescuing a kitten from a tree. Joshua uses his cape as a slide to help the creature slide down from a branch. In the panel, Josh pretends to be a superhero, but he is not depicted wielding superhuman powers or defying nature—he does not fly, he jumps. He does not fly into the tree to collect the cat; the narrative explains that he will "Climb up . . . ." He does not float from the tree with a cat in his hands—he cleverly uses his cape so that he can "slide down little cat." The panel depicts Joshua as an imaginative boy at play wearing a cape, not a superhuman.

Josh then holds off a bully (depicted as one of the few overweight people in Plaintiff's Work), who later joins Joshua and a circle of his friends around a football. Plaintiff's Work then captures Joshua in another moment of classic Americana, selling lemonade at a homemade stand outside of his home. Joshua's trim, nattily-dressed father looks on approvingly from the front stoop of the family home, his arm around the waist of Joshua's mother, who waves toward the line of neighbors who are waiting to buy from Joshua, cash in hand. Joshua then is off to the barber, where we see him first with a barber picking out his longer hair, and then, he is pictured at the end of the cut, smiling into a mirror.

Then Joshua joins his friends in a game of basketball. Joshua is pictured first throwing the "Ball through the hoop!" The shot by our hero, Joshua, swishes through the net, winning the

"GAME!!!"  Joshua is carried away in triumph on his friends' shoulders, game ball raised above his head in celebration.  For much of the rest of the book, Joshua wears a medal that he appears to have won in the basketball game.



Plaintiff's Work follows the rest of Joshua's day, as he and his friends work on the well-mown grass in their suburban neighborhood to construct a house that they post with a sign:  "No Parents Allowed."  That project takes them some time, as Plaintiff's Work dedicates two full panels to the project—the first shown in day, the second, at night, illuminated by lampposts and the magical illumination of a profusion of fireflies.  Then Joshua and his friends are shown capturing the fireflies:  Joshua holds a mason jar and lid as fireflies surround him and his friends, who look on with wonder.



Joshua and his friends continue their unstructured play on into the night in their lovely neighborhood.  We next see Joshua at home at night, peering into the night sky with a telescope, imagining alien life.  And last, Joshua tells us that after he eats, he goes to bed.  We see Joshua, tucked into bed in the loving embrace of his mother, basketball in hand.  All around him swirl images of his accomplishments for the day:  the jar of money collected selling lemonade, his rapping microphone, his basketball medal, his school books, and the jar of fireflies.  He reflects on all of the good things about himself and what he is capable of.  And he concludes, that as his mother exhorted him at the beginning of the book:  "I'm A BRILLIANT Little Black Boy."

So, in sum:  Plaintiff's Work uses a simple narrative structure.  It follows a day in the life of its protagonist, who narrates the events of the day.  The work starts with Joshua's evening, and Joshua's mother's enjoinder for him to be "brilliant."  The book then follows the course of Joshua's day.  He narrates each of the series of events that comprise his day in chronological order.  The moments in his day are illustrated graphically—in cartoon-like chronologic presentation in which separate panels show separate moments in the same chain of events:  jumping from place to place, changing hair style, shooting the winning shot and the events that follow.  At each step of his day, Joshua makes concrete progress—he succeeds in school, he makes money, he wins in sports—and

at the end of his day, he realizes that he has accomplished what his mother had asked the night before.  Through his series of accomplishments—symbols of which surround him as he reaches his epiphany—he has demonstrated to himself, and the reader, that he is a Brilliant Little Black Boy!

> b)      *Use of Language*

Plaintiff's Work presents Joshua's narration in a white band that appears to the side of, and apart from, the images it accompanies.  The text of Plaintiff's Work sometimes uses simple rhymes, but it does not consistently rhyme.  To illustrate, here's what Joshua has to say about one part of his day in school:

> I read books in our library
> That show our earth's a mystery
>
> Oceans filled with fish so deep,
> Some fish we'll never, ever see!
>
> Class experiments show
> How huge volcanoes overflow.
> They bubble deep from way below
> "Stand back!"  I say,
> "It's going to blow!"
>
> My classmates jump . . .
> and cheer . . .
> and then . . .
> WHOOOOOSSSHHH!!!
> The lava is safe, it's just pretend.
>
> I'm inventive!
> (but it's really not so scientific)
> There're [sic] mighty things I CAN DO,
> I believe—but first I THINK it!

The text is presented as a poem, but not one that consistently rhymes.

The text in Plaintiff's Work is written in the first person.  Joshua narrates what he does.  In several panels, Joshua describes one of his characteristics using the phrase "I'm a . . ."  For example, he states that "I'm a SMART little Black Boy!," "I'm an ARTISTIC little Black Boy!,"

"HANDSOME," "BUSINESS-OWNING," etc.  Joshua does not use this phrase in every panel in the book, however—only in six of them.  As in the title of Plaintiff's Work, Joshua exclusively uses the contraction "I'm" rather than "I am."

c)      <em>Visual Appeal</em>

Plaintiff's Work measures 11.5 x 9.5 inches and is presented in landscape format.  There are twenty-two sheets of paper between its hard covers.

As the reader can see from the selected images presented above, the artwork in Plaintiff's Work is cartoon-like.  It uses simple line drawings that are usually filled with simple solid colors.  The color palate of Plaintiff's Work generally uses bright hues.  There are no evident brushstrokes in Plaintiff's Work.  With a few exceptions—such as in the play of light over the faces of children watching fireflies—the artist pays little attention to shadow, and does not depict with care the volume of characters or objects.

The visual language of Joshua's world is cartoon-like.  Each house is a suburban archetype, set against perfectly mown lawns.  The barber shop has a barber's pole.  The people who are depicted in the book are also cartoon-like.  Plaintiff's Work does not attempt to depict the characters with any degree of realism.  Every person is lean—except for the three characters who are portrayed as overweight.  The book makes it easy for the reader to follow Joshua visually throughout the book:  except when he is wearing pajamas at the very end of his long day, he is always pictured wearing a red top—either a tee shirt, or a red pinny while playing basketball.

Plaintiff's Work is consistently composed of "spreads" that occupy two facing sheets of paper, as shown above.  As the Court has already described, the spreads often present multiple chronological moments in a single event like a cartoon strip, just without lines separating each of the separate moments in the series of events.  For example, the basketball game spread shows Joshua running up to the basket, the ball whisking through the basket and the ensuing celebration.  The

book presents the events of Joshua's day chronologically, and some of the spreads illustrate multiple moments from each event.

2.   *I Am Every Good Thing*

a)   *Narrative*

*I Am Every Good Thing* does not employ a traditional narrative structure.  Instead, it centers on a theme—that each of the Black boys who are pictured in the work embody a different strength or positive trait.  Defendants' Work features no central protagonist.  Unlike Plaintiff's Work, which deploys an obvious visual code to identify its protagonist, each of the boys depicted in Defendants' Work are visually distinct and appear to be completely different people, of different ages and skin tone, as shown below.



While Plaintiff argues that all of these children are "virtually identical," a reasonable lay person would see that the figures portrayed in these images are different human beings.

Defendants' Work has no plot.  It follows no specific chronology of events.  Instead, Defendants' Work presents several separate unconnected beats of images around the central theme. For example, in the first three vignettes, the book swoops from a purely fantastical image of a child in flight, to a winter scene where children make snowballs, to a summer scene of a child in shorts on a snowboard.

18



I am
a nonstop ball of energy.
Powerful and full of light.
I am a go-getter. A difference maker.
A leader.





Defendants' Work contains approximately nineteen such vignettes that are beats on its theme.  Among those are images of children engaged in what Plaintiff would call "various activities," such as a child looking into a microscope; people walking; children playing in a pool; children playing baseball; a child playing with his father and a basketball, and children rapping.  But it also depicts moments of stillness, with images of a child standing in the woods, the seated boy depicted above staring out of the frame, head haloed with light, and an image of a boy and young girl hugging.



And the work contains moments that are purely fantastical in nature—like the flying superhero, and an astronaut in space.

Defendants' Work is not bound to a particular protagonist, place or plot. Instead, its series of beats each illuminate the work's central theme—that any Black boy can have positive traits. Each vignette, and associated trait, stands on its own. There is no suggestion that, as in Plaintiff's Work, the goal for the children depicted is to accumulate a series of positive achievements in order to find validation. The boys voice their positive traits during moments when they are not depicted accomplishing a task, but also in moments of stillness and pure play. No parents stand by in Defendants' Work to encourage and reward the accumulation of the children's achievements.

If the narrative structure of *I'm A Brilliant Little Black Boy!* is like that of a Saturday morning cartoon from the 1980s, Defendants' Work is more like free-form Beat poetry. Unlike Plaintiff's Work, Defendants' Work is not presented in a chronological narrative. Nor is it linked to a particular place. And it freely weaves into the book images of events that are purely imaginary.

b)      *Use of Language*

A short statement is superimposed over each image in Defendants' Work. With two exceptions, the statements are not, as in Plaintiff's Work, set aside from the image in a text box. In each of the two exceptions, the statement stands alone in the center of a colored page facing the image to which it refers. Each of the statements begins with the declaration "I am." The text on each page is short. Where the text on each page of Plaintiff's Work consists of several stanzas; each page in Defendants' Work usually contains a single stanza. The statements are contemplative, and poetic, but do not rhyme. For example, one statement declares

> I am
> A nonstop ball of energy.
> Powerful and full of light.
> I am a go-getter.  A difference maker.
> A leader

And another

> I am tight hugs, a hand
> to hold, a shoulder to cry
> on—if you have to.
> I hope you never have to.
> I am here.

        c)       *Visual Appeal*

Defendants' Work measures 11.0 x 8.5 inches in a portrait layout.  There are eighteen sheets of paper between its hard covers.

Each of the images in Defendants' Work is an oil painting.  The artist does not use pencil to outline any of the images in the works.  Instead, images are crafted from visible brushstrokes.  The brushwork is used to show energy and motion, as well as to create shapes and depth.  People and objects in the images are shown in three dimensions; the artist pays particular attention to the play of light and shadow in each image.  The color palate is rich and deep.

Where Plaintiff's Work uses cartoon-like composition—with bands of activity depicted in a single plane—the composition of the images in Defendants' Work varies from picture to picture. For example, the artist uses dramatic foreshortening in order to create a sense of space, as in the image of children playing with snowballs inserted above.  Some images focus on a single central figure, also as shown above, while others portray groups.  Only one of the panels in Defendants' Work shows the passage of time in a single story-line, rather than a freeze-frame of a single moment in time:  a skateboarder is seen on the ground holding his knee only to get "right back on my feet again."

Many of the images in Defendants' Work span a two-page spread, such as the flying boy shown above.  But at least eight of the images in Defendants' Work are contained in a single page, as with the boy shown playing baseball, or the image of a seated child.

III.   **LEGAL STANDARD**

A.   **Motion to Dismiss**

A complaint need only contain "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a claim that does not meet this pleading standard for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). On a motion filed under Rule 12(b)(6), the court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are inadequate. *Iqbal*, 556 U.S. at 678 (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). And "[t]he tenet that a court must accept as true" a complaint's factual allegations does not apply "to legal conclusions." *Iqbal*, 556 U.S. at 678 (alterations omitted).

To survive dismissal, a complaint must allege sufficient facts to state a plausible claim. *Twombly*, 550 U.S. at 570. A claim is plausible when the plaintiff pleads facts to support the reasonable inference that the defendant has acted unlawfully. *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 556). The plaintiff's claim must be more than merely "speculative." *Twombly*, 550 U.S. at 545. And a reviewing court must "draw on its judicial experience and common sense" to determine plausibility. *Iqbal*, 556 U.S. at 679 (citation omitted).

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). "Generally, [courts] do not look beyond 'facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken.'" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46,

51 n. 2 (2d Cir. 2016)).  A court may consider "any 'written instrument' . . . attached to [the complaint] as 'an exhibit' or . . . incorporated in it by reference." *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ. P. 10(c) (other citations omitted)).  A court may also consider a document "solely relie[d]" on by the plaintiff if it "is integral to the complaint." *Id.* (quotation and brackets omitted).  A document is "integral to the complaint" if the complaint "relies heavily" on the document's "terms and effect." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016).

The expert reports appended to the complaint are largely irrelevant to the assessment of whether the two works are substantially similar.  "The well-established general rule in this circuit has been to limit the use of expert opinion in determining whether works at issue are substantially similar." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 713 (2d Cir. 1992).  "Outside a limited class of cases involving highly technical works such as computer software, such testimony is 'irrelevant and not permitted.'" *Green v. Harbach*, 750 F. App'x 57, 59 (2d Cir. 2019) (summary order) (quoting *Computer Assocs. Int'l*, 982 F.2d at 713).  Expert testimony "may be used to assist the fact finder in ascertaining whether the defendant had copied any part of the plaintiff's work." *Computer Assocs. Int'l*, 982 F.2d at 713.  But for purposes of this motion, Defendants have asked the Court to assume that Defendants copied the Work.  Thus, the only issue in this motion is whether that copying was "illicit."  The Court has reviewed the reports to understand the nuances of Plaintiff's argument, but it does not accept as true the expert's characterizations of the works for purposes of its analysis.  Because the motion to dismiss should be granted even when the Court considers the arguments presented in the expert reports, the Court does not take up here Defendants' motion to strike them.[4]

---

[4] The Court notes, however, that Defendants make strong arguments that the expert reports should not be treated as having been incorporated into the complaint because they are not "written instruments" within the meaning of Federal Rule of Civil Procedure 10(c).  Each expert report "is not a document that evidences legal rights or duties or sets forth

### B.      The Copyright Act

### 1.      Copyright Infringement Generally

The Copyright Act gives owners of a copyright "exclusive rights," 17 U.S.C. § 106, to

protect "original works of authorship," 17 U.S.C. § 102(a).  "To establish copyright infringement,

two elements must be proven:  (1) ownership of a valid copyright, and (2) copying of constituent

elements of the work that are original."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111

S.Ct. 1282, 113 L.Ed.2d 358 (1991); *see also Spinelli v. Nat'l Football League*, 903 F.3d 185, 197 (2d Cir.

2018) (*quoting Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109 (2d Cir. 2001)) ("To state a claim for

copyright infringement, a plaintiff must allege 'both (1) ownership of a valid copyright and (2)

infringement of the copyright by the defendant.'").  For purposes of this motion, Defendants do not

contest Plaintiff's ownership of a valid copyright in Plaintiff's Work.  Instead, they argue that

Plaintiff has not adequately pleaded the second element of its copyright claim.

"To satisfy the second element, a plaintiff 'must demonstrate that:  (1) the defendant has

actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists

between the defendant's work and the protectible elements of plaintiff's [work].'"  *Abdin v. CBS*

*Broad. Inc.*, 971 F.3d 57, 66 (2d Cir. 2020) (emphasis in original) (quoting *Yurman*, 262 F.3d at 110).

Again, for purposes of this motion, Defendants do not contend that Plaintiff has failed to plead

adequately that Defendants actually copied Plaintiff's Work.  Instead, they argue that the two works

are not substantially similar.

---

the legal basis for his claims and therefore does not satisfy the definition of 'written instrument.'"  *Smith v. Hogan*, 794 F.3d 249, 253–55 (2d Cir. 2015).  Even if the reports are not properly incorporated into the complaint, however, the Court might still properly consider them if they were "integral" to the complaint.  *Id.*  The expert reports at issue here appear to have been solicited and prepared before the filing of the complaint, and the complaint can be described as having relied heavily upon them.  However, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity[, relevance,] or accuracy of the document."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (*quoting Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).  And as described, above, there are disputes regarding the relevance of the reports for purposes of evaluating the substantial similarity of the works.  There are also substantial questions regarding accuracy of the reports, which, as will be touched on below, frequently mischaracterize the works.

2.        **Substantial Similarity**

"The standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,* 602 F.3d 57, 66 (2d Cir. 2010). When comparing works that have both protectible and unprotectible elements, a court must apply a "more discerning" test. *Id.* (quoting *Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.,* 25 F.3d 119, 123 (2d Cir. 1994)). In such cases, a court "'must attempt to extract the unprotectible elements from [its] consideration and ask whether the protectible elements, standing alone, are substantially similar.'" *Id.* (quoting *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),* 71 F.3d 996, 1002 (2d Cir. 1995)).

In applying this test, a court is not "'to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable.'" *Id.* Rather, the Court is "principally guided 'by comparing the contested design's 'total concept and overall feel' with that of the allegedly infringed work,' as instructed by [its] 'good eyes and common sense . . . .'" *Id.* (internal citations omitted). To this end, the Court must keep in mind "the distinction between a work's non[-]protectible elements and its selection, coordination, arrangement, and expression of those elements—which are protectible." *City Merchandise, Inc. v. Broadway Gifts, Inc.,* No. 08–CV–9075, 2009 WL 195941, at *2 (S.D.N.Y. Jan. 27, 2009) (quoting *Eden Toys, Inc. v. Marshall Field & Co.,* 675 F.2d 498, 500 (2d Cir. 1982)) (internal quotation marks omitted)). "This is so because 'the defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art—the excerpting, modifying, and arranging of [unprotectible components] . . . —are considered in relation to one another.'" *Peter F. Gaito Architecture, LLC,* 602 F.3d at 66 (quoting *Tufenkian Import/Export Ventures, Inc.,* 338 F.3d at 134).

26

When evaluating claims of infringement involving literary works, as here, "the 'more discerning' approach requires courts to consider 'similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting' of two works." *Lewinson v. Henry Holt & Co., LLC*, 659 F. Supp. 2d 547, 565 (S.D.N.Y. 2009) (*quoting Boisson v. Banian, Ltd*, 273 F.3d 262, 273 (2d Cir. 2001)).  And in an infringement action involving children's works, "[c]onsideration of the total concept and feel of a work, rather than specific inquiry into plot and character development, is especially appropriate . . . , because children's works are often less complex than those aimed at an adult audience." *Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996); *see also Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976) (explaining that "stories, intended for children, are necessarily less complex than some other works submitted to pattern analysis, [and that therefore] . . . in addition to the essential sequence of events," courts should "consider the total concept and feel of the works in question." (internal quotation marks omitted)).

The Court can undertake a substantial similarity analysis in the context of a motion to dismiss.  "When a court is called upon to consider whether the works are substantially similar, no discovery or fact-finding is typically necessary, because 'what is required is only a visual comparison of the works.'" *Peter F. Gaito Architecture, LLC,* 602 F.3d at 64 (quoting *Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 766 (2d Cir. 1991)).  "Thus, . . . it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation." *Id.*

### 3.    Non-Protectible Elements

The Copyright Act gives owners of a copyright "exclusive rights," 17 U.S.C. § 106, to protect "original works of authorship," 17 U.S.C. § 102(a).  However, not all elements of a work are entitled to copyright protection.  There are limitations on the scope of protection afforded by the Copyright Act, four of which are of particular importance in this case.

First, "ideas are not protected by copyright." *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 67 (2d Cir. 2020) (*quoting Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 135-36 (2d Cir. 2004)) ("[C]opyright does not protect ideas; it protects only the author's particularized expression of the idea."). "[T]he protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself." *Id.* (internal quotation omitted) (*quoting Reyher,* 533 F.2d at 90). "While the demarcation between idea and expression may not be susceptible to overly helpful generalization, it has been emphasized repeatedly that the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization." *Reyher*, 533 F.2d at 91.

Second, "generic and generalized character traits such as race, gender, and hair color are not protectible." *Abdin*, 971 F.3d at 67; *see also Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) ("[T]he less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly."). Similarities between characters that are "mostly generalized" have been found to be unprotectible. *Id.* (*citing Alexander v. Murdoch*, No. 10-cv-5613 (PAC), 2011 WL 2802923, at *5 (S.D.N.Y. July 14, 2011) (dismissing claim where both characters shared the same sex and hair color, as well as similar mannerisms), *aff'd*, 502 F. App'x 107 (2d Cir. 2012) and *Cabell v. Sony Pictures Entm't, Inc.*, 714 F. Supp. 2d 452, 454 (S.D.N.Y. 2010) (granting summary judgment where characters were both military-trained hairstylists who fight crime with hairdryers as weapons), *aff'd*, 425 F. App'x 42 (2d Cir. 2011)).

Third, "also unprotectible are scènes à faire . . . ." *Id.* The Second Circuit has described scènes à faire as "'sequences of events which necessarily follow from a common theme,' and 'incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic . . . .'" *Id.* (internal citations omitted) (quoting *Reyher*, 533 F.2d at 91 (2d Cir. 1976) and *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980)).

"[E]lements of a work that are indispensable, or at least standard, in the treatment of a given topic—like cowboys, bank robbers, and shootouts in stories of the American West—get no protection." *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 102 (2d Cir. 2014) (internal quotation marks omitted). "Copyright protection does not extend to 'stock' themes commonly linked to a particular genre." *Abdin*, 971 F.3d at 70–71 (internal quotations and citation omitted). "The scènes à faire doctrine also prevents 'stock characters' from receiving copyright protection." *Lewinson*, 659 F. Supp. 2d at 567 (quoting *Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004) ("A stock character is a stock example of the operation of the [scènes à faire] doctrine. . . .")).

Fourth, "it is axiomatic that words, short phrases, titles, and slogans are not subject to copyright, even if they can be trademarked." *Moody v. Morris*, 608 F.Supp.2d 575, 579 (S.D.N.Y. 2009). The use of single words or short phrases may not exhibit the minimal creativity required for copyright protection. *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992). Still, "a defendant's copying of an ordinary word or phrase is actionable where she has also appropriated enough of plaintiff's sequence of thoughts, choice of words, emphasis, and arrangement to satisfy the minimal threshold of required creativity." *Arica*, 970 F.2d at 1073 (internal quotation omitted) (*quoting Salinger v. Random House, Inc.*, 811 F.2d 90, 98 (2d Cir. 1987)). The doctrine of "comprehensive non-literal similarity" allows copyright protection even where there is no "word-for-word or literal similarity" between two works. *Id.* "A plaintiff succeeds under this doctrine when it shows that the pattern or sequence of the two works is similar." *Id.*

## IV.    ANALYSIS

The two books at issue are not substantially similar. The total concept and feel of the books, which receives heightened attention when comparing children's books, is not substantially similar, but, rather, is clearly distinct. The works share a common theme—empowering Black boys—but that is not an idea that Ms. Bynum and her company can monopolize through Plaintiff's copyright.

Otherwise, the tone, mood, plot, text, and imagery of the words as a whole are so evidently different that no reasonable layperson would find the works to be substantially similar.

### A.      Total Concept And Feel

The total concept and feel of the two books is extremely different.  The Court reaches this conclusion through an examination of the various features of the works, as will be discussed, but also as a result of a comparison of the works as a whole.  Both books share—to a degree—a common goal, which is to promote the self-esteem of Black boys.  Both books target children.  But the concept and feel of the books is entirely different.  Plaintiff's Work uses the visual idiom of cartoons, and extended text to narrate a life in the day of one ideal Black boy, living in an ideal neighborhood, with ideal parents.  Defendants' Work has no narrative; it follows no lead character. It uses richer visual language in its oil-painted panels and short evocative statements.  Plaintiff's Work is narrative; Defendants' is contemplative.  Both works feature Black children engaged in the activities of children, but the total concept and feel of the two works diverge enormously.

The complaint's allegation that the works share a "common tone and mood" is simply an inaccurate characterization of the books.  FAC ¶ 25.  The rationale presented for this conclusion by Plaintiff simply underscores the fact that Plaintiff is seeking to monopolize through its copyright the expression of a non-protectible idea.  "Both works take on celebratory, earnest tones designed to uplift readers . . . and share the desire to promote positive cultural representations of young black boys and do so effectively . . . ."  *Id.*  That the two children's books take on "celebratory, earnest tones" does not make them substantially similar.  This is not only common in children's books, but entirely expected.  *See Lewinson v. Henry Holt & Co., LLC,* 659 F. Supp. 2d 547, 577 (S.D.N.Y. 2009) ("an upbeat mood is to be expected from works geared toward children, let alone children's works involving the theme of peace (indeed, who would write a book discussing children's desire for war?").

And Plaintiff's argument reveals its fundamental flaw:  Plaintiff argues that the works are similar because of the intention behind the creation of the works, rather than the tangible manifestation of that intention.  *Id.* (the works "share the desire to promote").

**B.      Theme**

As noted, both works share a common underlying theme:  the promotion of self-esteem in Black boys.  That theme is not protectible by copyright law.  *See Cavalier v. Random House*, 297 F.3d 815, 828 (9th Cir. 2002) ("The themes of teaching children to have confidence, to overcome their fears, and to try are not only too general to be protected but are also standard topics in children's literature.").

And below that headline similarity, the works have completely different approaches to the promotion of self-esteem in their target audiences.  *I'm A Brilliant Little Black Boy!* emphasizes the importance of achievements—the kind of achievements that many parents, including Joshua's, want from their children.  Joshua begins his day with his mother directing him to "be brilliant."  And the rest of the story follows him as he obeys that direction:  he is studious and well-behaved at school; he makes money as a "business-owning" Black boy; he wins a basketball game.  At the end of the book, with images of his daily accomplishments surrounding him, he recognizes that he is a Brilliant Little Black Boy!

*I Am A Brilliant Little Black Boy!* presents Joshua's story within the frame of an idealized version of a suburban life.  Joshua has two healthy, engaged parents who appear in the story to support and guide him.  The other children in his school and neighborhood are (with the exception of one bully, who is quickly turned around) playful and well-behaved.  He lives in a large stand-alone house, surrounded by other stand-alone homes, in a well-kept community where children can be left to play outside with "No Parents Allowed" into the evening.  *I'm A Brilliant Little Black Boy!* places its hero in an idealized environment in which he thrives.

*I Am Every Good Thing* does not share Plaintiff's focus on activity and achievement as the generator of positive traits. Instead, it focuses on the inherent positive traits of the characters depicted, often using evocative language. "I'm a *cooooool* breeze. A perfect paper airplane that glides for blocks, for miles, forever." Defendants' Work does not place the children depicted in any particular setting: it presents affirming moments from an array of experiences.

So the two works share a common theme only at the most superficial level—namely that they both focus on developing the self-esteem of Black boys. Plaintiff's Work promotes activity in the context of an idealized, well-resourced suburban world. Joshua is brilliant because of what he is able to accomplish in that structure. Defendants' Work does not place its characters in any social context—it promotes inherent positive traits independent of achievement or activity. As a result, arguably, Defendants' Work promotes a different vision of self-esteem, one that can be accomplished by children without all of the benefits of Joshua's supportive social environment, and by children who are not as successful in all aspects of their lives as Joshua.

C.     **Characters**

The two works do not share common characters. "The bar for substantial similarity in a character is set quite high." *Abdin v. CBS Broad., Inc.,* 405 F. Supp. 3d 591, 599 (S.D.N.Y. 2019), *aff'd,* 971 F.3d 57 (2d Cir. 2020). These works do not approach that bar. Plaintiff's Work has a central protagonist. Defendants' Work has none. As described above, while Plaintiff's complaint acknowledges this essential fact, Plaintiff argues that there is a similarity in the characters represented in the two works because "the same unnamed character in several of the double-page spreads: a young Black boy, the same age as Joshua, portrayed doing several of the same activities." FAC ¶ 25. But Plaintiff does not identify this child. As already noted, while Plaintiff's Work flags Joshua with a red shirt to help the reader follow him throughout the day, there is no central character who can be easily visually tracked in Defendants' Work.

Similarly, Plaintiff's contention that there is some overlap in characters presented in the book because both books present people who are "lean . . . [and] slightly average, average in terms of height and build" is very close to frivolous. *Id.* It is well-established that "generic and generalized character traits such as race, gender, and hair color are not protectible." *Abdin*, 971 F.3d at 67. The depiction of "lean" people of "average" build in Defendants' Work as well as Plaintiff's does not mean that Defendants have violated Plaintiff's copyright. And Defendants' Work does not violate Plaintiff's copyright because both works depict Black boys.

Again, Plaintiff's contentions about why it sees similarities in the works is worth noting only because it reveals the profound misconception of the protection afforded by copyright law that underlies its position. Plaintiff asserts that the characters in the works "share qualitative similarities in that they are created to expand the representational field for Black male children so that as many young Black male readers can identify with the characters and activities shown throughout the book." *Id.* Plaintiff cannot base its copyright infringement claim on its view of the purpose motivating the creation of the characters, rather than the manifestation of perceptible traits that the characters share.

### D.      Plot, Sequence and Pace

Plaintiff's Work has a plot; Defendants' Work does not have a plot. So the works share no similarity in plot or sequence. Plaintiff's allegation with respect to this issue mischaracterizes the works, and, again, reveals how thin its argument is. Plaintiff contends that the books are similar because the "plots follow the protagonist as they engage in various activities at a similar if not identical pace." FAC ¶ 25. At the outset, the contention that the plots of two books are substantially similar because the protagonists in each "engage in various activities" is risible. More significantly here, as described, Plaintiff's allegation mischaracterizes the works: Defendants' Work

has no protagonist, and it has no plot.  It has a rhythm but not a pace of storytelling, because it is not telling a story.

### E.      Setting

The two works do not share a setting.  Joshua's story takes place in the environs of his safe, comfortable suburban neighborhood.  Defendants' Work does not have setting for its story, because, again, it has no story.

As the Court will describe below, each of the works contains scenes where the children are engaged in the same activity—namely, playing basketball and rapping.  Even examining those specific images atomistically, their settings differ:  Joshua narrates that he raps during lunch at school, and a picnic table is shown behind him.  The rap image in Defendants' Work shows the performer on a stage with people holding up cellphones in the foreground to photograph the performance.  And Joshua's basketball game is depicted as taking place in a full outdoor court, while the scene involving a basketball in Defendants' Work appears to depict a basket that is not mounted at regulation height, perhaps in a driveway.

### F.      Artwork and Layout

The style of the artwork in the two works is dramatically different.  Plaintiff concedes this in its complaint.  FAC ¶ 32 ("the Work's artistic style is cartoonish, and Defendants' book [is] more in a brushstroke style . . . .").  Plaintiff's Work uses cartoon-like images, crafted with line and a colored fill.  Most of the images are flat.  The composition of the images in the work is also simple, and cartoon-like.  Plaintiff's Work places each image in a distinct, identifiable physical setting.  Defendants' Work contains oil paintings with visible brushstrokes.  The artist focuses on the volume of people and objects; and uses a substantially more dynamic range of color and composition than Plaintiff's Work.  Defendants' Work does not always place the characters in an identifiable physical

space—they are frequently surrounded only by fields of color.  The style of the artwork deployed in each of the two books is very different.

Consistent with its cartoon-like format, the imagery in Plaintiff's Work consistently spans two facing pages, so that the scene occupies a two-page spread.  The imagery in Defendants' Work uses two-page spreads, but not consistently, as the complaint inaccurately describes.

The works are not, as the complaint alleges "nearly identical in format."  FAC ¶ 25.  The works are different sizes.  Plaintiff's Work measures 11.5" x 9.5"; Defendants' measures 11" x 8.5". And the orientation of the books is different—Plaintiff's Work is presented in landscape format, while Defendants' Work is in portrait format.  Plaintiff asserts that there is some similarity in the works because they both "feature glossy covers with foil embossing."  At the outset, Plaintiff cannot assert a copyright in "glossy covers," not even ones with foil embossing—the Court can take judicial notice of the fact that children's books frequently use glossy covers.  But an examination of the works' covers shows how little similarity there is between them.  Defendants' Work uses gold foil in the title of the book in an all-caps Art Deco font.  Plaintiff's Work uses a completely different font and the metallic foil is not used in the lettering of the title, but in the stars above it.

 

The works also have a different number of pages.  The complaint alleges that both books are "32 pages long."  *Id.*  But this is factually inaccurate.  There are 22 double-sided sheets of paper between the covers of Plaintiff's Work.  Thirty four single-sided pages contain the illustrations and text of the book.  There are 18 double-sided sheets of paper between the covers of Defendants' Work.  Twenty nine single-sided pages contain the illustrations and text of the book.

### G.    Text

The two books use text in a very different manner.  First, the text is presented differently in each work.  Plaintiff's Work places narrative text in a white text box to the side of each illustration.  The text in Defendants' Work is superimposed over, and integrated with the art.  The text is placed in different locations, depending on the composition of the image.  This visual treatment of the text underscores the lack of substantial similarity between the works.  *See, e.g., NSI Int'l, Inc. v. Horizon Grp. USA, Inc.,* No. 20-CV-8389 (JGK), 2021 WL 3038497, at *4 (S.D.N.Y. July 16, 2021) (finding no substantial similarity noting that "[t]he graphics differ in their coloring, the order in which they are presented, the scientific matter which is depicted, and the placement of the descriptive text . . . on NSI's package . . . [t]he text is wrapped around the top of the circle.  On the other hand . . . the descriptive text is overlaid on the bottom of the graphic [on Horizon's package]").

Moreover, the nature of the text differs.  Plaintiff's Work uses narrative text that is usually multiple stanzas in length.  Plaintiff frequently deploys child-friendly rhymes in the text presented in its work.  Defendants' Work deploys much shorter text.  With one exception targeted by Plaintiff, the text used in Defendants' Work has rhythm but does not rhyme.

The use of the phrase "I am" and "I'm" in the two works does not make them substantially similar.  "[A] defendant's copying of an ordinary word or phrase is actionable where she has also appropriated enough of plaintiff's sequence of thoughts, choice of words, emphasis, and arrangement to satisfy the minimal threshold of required creativity."  *Arica Inst., Inc. v. Palmer*, 970

F.2d 1067, 1073 (2d Cir. 1992).  The shared use of the term does not come near that standard here.

First off, Ms. Bynum's use of the words "I am" is far from unique:  God said to Moses "I AM

WHO I AM."  Exodus 3:14.  Plaintiff cannot claim a copyright in the phrase.

Moreover, the use of this ordinary phrase in the works does not show appropriation of the

phrase.  Defendants' Work uses the phrase "I am" in all but one of its pages, as it does in its title.

Only once does it use "I am" in its contracted form, "I'm."  The phrase "I am" starts nearly all of

the stanzas in Defendants' Work.  Plaintiff does not use the full phrase "I am."  Instead, Plaintiff's

Work consistently deploys the contraction "I'm," as in its title.  Plaintiff uses the word "I'm" in

multiple pages of its text—but not nearly in all.  Plaintiff's Work has 17 text boxes; Joshua says

"I'm" in just six of them—typically at the end of a page of narrative.  So the use of the phrase "I

Am" in Defendants' Work is substantially different from that in Plaintiff's Work.  That both works

have titles that use the term "I am" or "I'm" does not make them substantially similar.

H.     **Plaintiff's Perceived Similarities**

The vast differences in the artistic style, text, plot, pace, setting and characters, as well as the

works' other features, result in each having an utterly distinct concept and feel.  Particularly with an

artistic work designed for children, this comprehensive assessment of the work is the appropriate

way to evaluate whether the works are substantially similar.  *See, e.g., CK Co. v. Burger King Corp.,* No.

92 CIV. 1488 (CSH), 1994 WL 533253, at *6 (S.D.N.Y. Sept. 30, 1994), *aff'd,* 122 F.3d 1055 (2d Cir.

1995) ("A graphic or three-dimensional work is created to be perceived as an entirety.").  Plaintiff

correctly argues that "excessive splintering" of the elements of a work is not the correct approach to

evaluate substantial similarity.  Opp'n at 6 (*quoting New Old Music Grp., Inc. v. Gottwald*, 122 F. Supp.

3d 78, 94 (S.D.N.Y. 2015)).  But apart from the fact that both works focus on positive traits of Black

boys, much of Plaintiff's argument is based on just that kind of argument.  Plaintiff targets six

images from amongst the dozens contained in the works to argue that purported similarities in those

excerpts from the books demonstrate the substantial similarity between the books as a whole. The concerns targeted by Plaintiff do not make the look and feel of the works substantially similar when viewed in context of the work as a whole. They are of limited import even when considered standing alone, which the Court takes up now.

      1.      **Child with Cape**

Plaintiff contends that Defendants' Work violates its copyright because both works contain images of children in capes. Plaintiff contends that both works show the child leaping or flying. These are the images that Plaintiff claims to be similar.

 

The reader has seen these images before: the image on the left is from Plaintiff's Work; the one on the right is from Defendants' Work. These images are not so similar as to establish copyright infringement. At the outset, the concept of a person wearing a cape is not an original idea subject to copyright. (If it is, Plaintiff and Defendants should watch the mail for something from D.C. Comics.) Second, these images are totally different. As the Court described earlier, the image on the left shows Joshua jumping, not flying. The text of the page that accompanies the image says that he is jumping. On the right, we see a moment of pure fantasy—a child actually flying.

The positions of the children in the air are distinct. Both of Joshua's arms are in front of his head, his legs are stretching forward in front of his body toward his landing, like a long jumper before he hits the sand. Joshua looks forward toward his landing. By contrast, the child in

Defendants' Work is the classic pose of a flying superhero, one arm thrusting forward, the other tucked to his sides; his legs extend behind his body.  He looks back, smiling, to something or someone not pictured in the frame.  Both children are wearing capes, but they are distinct in color and form:  Joshua's is the simple red piece of cloth he later uses as a slide; the other child's cape is more complex—a concoction of maroon, black and white that feathers around the child's body. These are both images of children in capes, but profoundly different images depicting children engaged in different activities.

Plaintiff's selection of the excerpt of its book for this comparison is misleading—characteristic of the excessive splintering of the works that is the backbone of its arguments. Plaintiff compares the entirety of Defendants' two-page panel spread to a single component of an image in its work.  The entire panel showing Joshua jumping from which Plaintiff has extracted this one unit for comparison is presented below:



In Plaintiff's Work, the image of Joshua that Plaintiff presents as a comparator to the flying child in Defendants' Work is a small subset of the entire image.  The panel also features him crouching as he jumps off desks and onto walls; climbing a tree; and saving a cat.  The image

contains other objects—the desk, the tree, a wall, the ground, together with other characters cheering.  Defendants' Work has none of this—just an image of a child flying against a blue sky.

### 2.     Science and Space

Plaintiff also points to two sets of images from the works containing images of children using scientific instruments and space to support its argument that the works are substantially similar.  The two images that Plaintiff has selected from the books are these.  Plaintiff's Work is seen above.  The images from Defendants' Work is below.





The idea of a child conducting a science experiment or thinking about space is not protectible. They are among the activities depicted in Plaintiff's Work that, as Plaintiff describes, "boys like to engage in." FAC at 8. They are scènes à faire.

And the imagery used in the works is very different. The image in Plaintiff's Work consists of a single two-page panel. In it, Joshua looks up into the sky through a telescope. To his side, the book depicts images of archetypal aliens that play in his imagination as he looks up to the sky. In Defendants' Work, the boy wearing a lab coat does not look up into the sky—he looks down into a microscope. He is surrounded by a psychedelic array of magnified cells and nuclei. They segue into an image of a suited astronaut floating between two planets. The astronaut gives the reader a thumbs up and waves. There are no fantastical aliens in Defendants' Work. So apart from the fact that the images each portray a child looking through a scientific instrument, and the concept of space—they are dissimilar.

3.      **Basketball**

Both works include images of children playing basketball that are not sufficiently similar to support a claim of copyright infringement.  The depiction of children playing basketball is a scène à faire—as Plaintiff states, a simple activity that boys like to do.  Plaintiff cannot copyright the concept of an image of children playing basketball.





Plaintiff's Work is a chronological account of the end of Joshua's basketball game.  The full image shows him running the court, his ball swishing through the net, and then Joshua being carried aloft in celebration by his friends.  Joshua thrusts the ball above his head, victorious.  The scene takes place in a full basketball court with baskets at normal height.  By contrast, Defendants' Work shows a single moment in time:  The child is hoisted into the air by his father.  It may be that the boy is going to dunk the ball, but perhaps he is just carried away in the joy of the moment with his father—for his eyes are closed, and his head looks down, not toward the basket.  The setting for this image is different.  The basket is not situated in a full basketball court.  The basket is too low to be at regulation height (unless the father is enormously tall); the image may capture a moment from a driveway with a low hoop.  Both images show children holding basketballs above their heads, but the story depicted in each image, and the artistic choices made in each are very different.

Here too, Plaintiff's complaint presented a misleading excerpt from the complete image to draw its comparison.  The entire panel is featured below.



And Plaintiff mischaracterizes the two works in its complaint.  Plaintiff alleges that both "Works feature an image of a young black boy being raised in celebration on the shoulders of someone cheering him on, preparing to dunk a basketball."  FAC at 10.  Joshua is being raised in

celebration, but he is not preparing to dunk a basketball—we saw his shot swish in earlier in the panel:  "Ball through the hoop!"  The boy in Defendants' Work is not being raised in celebration—there is no accomplishment to celebrate.  He is being raised in a moment of joy by his father—in his arms, not on his shoulders.  And it is unclear if he intends to dunk the ball.

4.      **Rapping**

Plaintiff's assertion that its copyright claim is supported by the fact that both books depict people rapping.  Plaintiff cannot assert a copyright in the depiction of people rapping—that generic idea is not protectible.  And, as with the other examples described above, the images of people rapping in the two works are substantially different.  The two images at issue are shown below.






The differences in the works are manifest.  In addition to the works' differing artistic styles, each depict a person rapping in a different setting:  Joshua raps in a school yard, with some friends watching on.  The artist in Defendants' Work is on stage; cell phone cameras flash and capture him as he performs.  Plaintiff's image is static; Defendants' Work shows the rapper in motion at various points in time.

What then is Plaintiff pointing to as the similarities between the works?  One of Plaintiff's experts circles what he views as the similarities in his analysis of the works.

    

Ex. K. at ECF p. 105.

As shown above, Plaintiff contends that the image violates Plaintiff's copyright because both images of rappers show a person with a microphone and show a person pointing.  But Plaintiff

cannot monopolize through its copyright the idea of a rapper using a microphone or the idea of

people pointing through its copyright.  The depiction of those features is profoundly different in the

two works.  Joshua holds the microphone to his mouth, while the allegedly infringing depiction of a

microphone in Defendants' Work is slung down below the rapper's waist.  The pointing finger that

Plaintiff flags in Plaintiff's Work is on the hand of one of Joshua's friends, pointing down toward

the rapper.  In Defendants' Work it is the rapper who points—and he points upward.  The

similarities between the work are trial or unprotected—the differences are manifest.

### 5.      The Act of Raising One's Arms Above One's Head

Plaintiff also asserts that the works are substantially similar because both works include

images of Black children raising their arms above their heads.  The images that Plaintiff targets are

pictured below.



46



The similarity between the two panels is the fact that each pictures a Black child at the lower right of an image shown with his arms outstretched above his head.  Plaintiff cannot copyright that gesture, which is used by humanity in a variety of contexts.  The gesture is used in two very different contexts in each of the two works.  In Plaintiff's Work, Joshua is shown raising his arms in celebration, embracing the literal and figurative gold stars from the day that surround him.  In Defendants' Work, a shirtless child in goggles and a snorkel is seen splashing in a pool.  The water erupts beneath him, suggesting that he has either jumped into the pool or splashed the water with his arms.

The setting of each image is different.  In Plaintiff's Work, Joshua is featured in his bedroom with his mother tucking him in bed, along with several props that remind readers of Joshua's adventures.  In Defendants' book, the protagonist is in a swimming pool with other children.  The composition of each of the images is different—the child's outstretched arms in Defendants' Work occupy nearly the entire two-panel frame, and part of one of his arms is not pictured.  The image of Joshua occupies just over half of the frame and both of his arms are fully visible.  But for the fact that both works show a Black boy reaching up from the right side of an image with his arms outstretched, the images are profoundly different.  The depiction of the use of that gesture by a human being is not protectible.

###### 6.    A Group of Black Children Standing Together

Plaintiff also contends that Defendants' Work violates its copyright because both works feature images of a group of Black children standing together.  These are the final set of images that Plaintiff identifies to support its claim that the works are substantially similar.





The excerpt from Plaintiff's Work is shown above.  The image from Defendants' book is shown below.

Plaintiff alleges that these panels "when stripped down to their most basic elements, are nearly identical."  FAC ¶ 31.  The complaint goes on to describe the similarity of the images as follows:  "In both works, there is an illustration of a crowd or montage of headshots of young Black

boys who vary in age and skin tone looking out towards and past the reader. In both, one boy has an Afro, and one wears glasses. In the Work, one wears a hat—in Defendants' Book he wears a hood." *Id.*

Plaintiff's argument that the images are virtually identical because each depicts a child whose head is covered—disregarding the fact that one wears a hat, and the other, a hood—is nearly frivolous. In the same way that Plaintiff cannot protect the idea of an image of a Black child with a head covering—any head covering, regardless of type—neither can it protect the idea of the depiction of a Black child with an Afro or wearing glasses. The depiction of each of these things in the two works varies dramatically—for example, the boy in Plaintiff's Work wears circular wire rim glasses; the boy in Defendants' Work wears thick black rectangular glasses.

Plaintiff also asks the Court to ignore the differences in the settings of the two images. As described above, the image from Plaintiff's Work captures Joshua and his friends in the act of collecting fireflies. They are not, as Plaintiff mischaracterizes in the complaint, looking out of the "towards and past the reader." *Id.* The children are looking at the fireflies that surround them. There are no adults in the frame. Defendants' Work depicts a series of contemporary children who are looking out of the frame. Behind them stand an array of ancestors who represent the history and development of African-Americans: a man in traditional African dress, a man carrying cotton, a Pullman porter, a man in an Afro raising a fist, Justice Thurgood Marshall in judicial robes, and, finally, President Barack Obama.

Plaintiff's argument that these works are "virtually identical" is explicable only by Plaintiff's decision to strip them down to their "most basic elements:" they are both pictures that depict Black children whose faces are directed toward the reader. But those "most basic elements" to which Plaintiff reduces the images are not protectible. The images themselves are substantially different.

Considering the works in their entirety, it is clear that the total look and feel of the works is not substantially similar.  And the Court's evaluation of the handful of images that Plaintiff points to in support of its argument underscores the substantial differences between the works that Plaintiff attempts to strip away.

       **7.**       **Rhyme and Time**

Finally, the Defendants' Work does not illicitly copy Plaintiff's rap "poem."  Plaintiff finds actionable infringement in the fact that both books use the words "rhyme" and "time" in their rap stanza, as well as the phrase "BOOM BOOM."  These are the stanzas from each work.

> *Plaintiff's Work*
>
> It's way cool fun, when words just come,
> I spin my words to the rhythm!
> Before school and even lunch time
> my friends and I just rhyme and rhyme.
> "BOOF BOOF, BOOM BOOM"
> line after line,
> we free-flow cool words all the time,
> Beats, syllables,
> Words, thoughts and rhyme . . .
> Oh yea, oh yea . . . it's poetry time!
> Beats, syllables, words,
> thoughts and rhyme!
> . . . HIP-HOP, don't stop . . .
> it's poetry time
>
> *Defendants' Work*
>
> I'm the BOOM-BAP—
> BOOM-BOOM-BAP
> when the bass line thumps and the
> kick drum jumps.
> I'm the perfect beat, the perfect rhyme,
> keeping everything on point and
> always on time—
> but you already knew that.

These stanzas are very different.  At the outset, the stanza from Plaintiff's Work is just one of two lengthy stanzas from the text at issue, which is depicted in an image earlier in this opinion.

50

Plaintiff's Work provides a narrative of part of Joshua's day.  The short stanza from Defendants' Work stands alone with its accompanying image.  Both stanzas use the phrase "BOOM BOOM," as an onomatopoeia for the sound of a bass line in Defendants' Work; one assumes it is used as such in Plaintiff's Work as well.  Apart from the single common use of that term to describe a common feature of rap music, the two stanzas share a single rhyming couplet:  "rhyme" and "time."  The phrasing and context of the use of those words is different in each work.  And it is an obvious combination, one so obvious that Plaintiff's Work uses it three times in a single short stanza.  The limited shared features of these stanzas of text does not suffice to establish that Defendants' Work infringes on the copyright held by Plaintiff.

## V.    LEAVE TO AMEND

Defendants' motion to dismiss is granted without leave to amend.  "The court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).  "A plaintiff need not be given leave to amend if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint."  *TechnoMarine SA*, 758 F.3d at 505.  Any amendment to the complaint would be inherently futile because the works are what they are.

## VI.    CONCLUSION

"The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'  To this end, copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed

by a work." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 111 S. Ct. 1282, 1290, 113 L. Ed. 2d 358 (1991). In this suit, Plaintiff seeks to use its copyright to monopolize the idea of an illustrated children's book that promotes self-esteem for Black boys—its idea, rather than its expression of the idea. The Copyright Act allows room for the different expressions of that concept in the works at issue in this case: room for a book that promotes self-esteem through the fortune and accomplishments of Joshua, and for one that promotes inherent value expressed in simple everyday moments, like a brother hugging his sister. Because the books are not substantially similar, Defendants' motion to dismiss Plaintiff's claim is GRANTED with prejudice. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 30, to enter judgment for Defendants and to close this case.

SO ORDERED.

Dated: July 5, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge

52